

**ORDERED in the Southern District of Florida on July 7, 2017.**

John K. Olson, Judge
United States Bankruptcy Court

___

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division
www.flsb.uscourts.gov**

In re:

Sigma-Tech Sales, Inc.,    Case No.: 14-11366-JKO
    Debtor.    Chapter 7
_____/

Scott N. Brown, as Chapter 7 Trustee,

    Plaintiff,    Adv. No. 15-01389-JKO

v.

Alan Luboff, an individual, Melissa Luboff,
an individual, Disc-O-Tech, Inc., a Florida
corporation, Gold Star Technology, Inc.,
a Florida corporation, and AHLO, Inc.,
a Florida corporation,

    Defendants.
_____/

**FINDINGS OF FACT, CONCLUSIONS OF
LAW AND MEMORANDUM OPINION**

THIS ADVERSARY PROCEEDING came before the Court for trial on April 26, 2017 on the *Amended Adversary Complaint* ("the Complaint") [ECF 81] filed on December 16, 2015, by Scott N. Brown, as Chapter 7 Trustee (the "Plaintiff" and/or "Trustee") of the bankruptcy estate of Sigma-Tech Sales, Inc. (the "Debtor") as scheduled by the Court's Order [ECF 330] entered March 14, 2017. Because Alan Luboff ("Mr. Luboff") and Melissa Luboff ("Mrs. Luboff") (together, the "Luboffs") filed for personal bankruptcy on April 21, 2017, in Case No. 17-14965-RBR, the adversary proceeding proceeded to trial on April 24, 2017 only against Disc-O-Tech, Inc. ("Disc-O-Tech") and Gold Star Technology, Inc. ("Gold Star"), both of which failed to appear. Following a sufficient evidentiary showing by the Trustee, the Court found that these entities were liable in the amounts sought and accordingly entered a Final Judgment as to Count X and Count XI against Disc-O-Tech and Gold Star awarding $6,905,597.86 in damages against each entity by Final Judgment [ECF 347] entered April 26, 2017.

After the Plaintiff obtained relief from the automatic stay imposed by the Luboffs' personal bankruptcy by Order [ECF 11] entered April 26, 2017, in Case No. 17-14965-RBR, this adversary proceeding proceeded to trial on April 26, 2017 against the Luboffs as to Counts I, II, III, and VII of the Complaint. *See* Pl.'s Ex. 107. The Complaint alleges that Mr. Luboff and Mrs. Luboff are liable for fraudulent transfers in Counts I, II and III, and that Mr. Luboff breached his fiduciary duties and is an alter ego of the Debtor in Count VII. Having considered the pleadings, the Joint Pretrial Stipulation

[ECF 328], the testimony of witnesses, the exhibits admitted into evidence, and the arguments of Plaintiff's counsel, the Court makes the following findings of fact and conclusions of law:

## JURISDICTION AND VENUE

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b), as this is a civil proceeding arising in or related to a case under the Bankruptcy Code. The Court also has jurisdiction under 28 U.S.C. § 1334(e), as this adversary proceeding involves property of the Debtor's estate. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of this proceeding is properly before the Court pursuant to 28 U.S.C. § 1409.

## FINDINGS OF FACT

Mr. Luboff incorporated the Debtor Sigma-Tech Sales, Inc., in 1999, and was the president and sole shareholder of the Debtor and in charge of its day-to-day operations. Pretrial Stip. ¶ 1, 11. Mrs. Luboff is the spouse of Mr. Luboff, and was a director of the Debtor from 2006 until June 28, 2011. *Id*. *See also*, Pl.'s Ex. 91. The Debtor was involved in the purchase and sale of consumer electronics and accessories through 2010. *Id*. at ¶ 13. The Debtor filed for protection under Chapter 7 of the Bankruptcy Code on January 21, 2014 (the "Petition Date"). *See* Main Case ECF 1.

From December of 2009 through May of 2010, the Debtor incurred over 4.5 million dollars of debt. In 2007, Office Depot, Inc. ("Office Depot") sued the Debtor alleging it had failed to pay customer rebates, and in December of 2009, the parties entered into a settlement agreement under which the Debtor agreed to pay $3,669,920.60

to Office Depot.  Pretrial Stip. at ¶ 4; Pl.'s Ex. 6, 11.  The Debtor provided no payments to Office Depot, and as of the Petition Date, the Debtor owed Office Depot $4,565,381.23 based on its proof of claim.  Pretrial Stip. at ¶ 4.  On August 27, 2009, New England Technology, Inc. ("New England") sued the Debtor for failing to pay for goods.  *Id.* at ¶ 9; Pl.'s Ex. 7, 9.  On May 24, 2010, the Debtor settled the matter with New England by promising to pay $950,000.  Pretrial Stip. at ¶ 9.  The Debtor defaulted, and on March 12, 2012, New England obtained a consent judgment against the Debtor in the amount of $1,250,000.  *Id.*; Pl.'s Ex. 10.  The Debtor failed to pay any amount owed to New England, and as of the Petition Date, the Debtor owed New England $1,365,157.75 based upon its proof of claim.  Pretrial Stip. ¶ 9.

During 2009 and 2010, while the Debtor incurred $4.5 million in debt, Mr. Luboff caused the Debtor to transfer a total of $153,485.07 to or for the benefit of the Luboffs (the "Debtor Transfers").  Pretrial Stip. ¶ 16.  The Debtor ceased to do business in mid-2010, and reported no income on its tax returns filed after 2010.  *See* Debtor's 2004 Exam. Tr. 39:9-39:14; Pl.'s Ex. 52, 62-65.

After the Debtor ceased to do business, on June 22, 2010, Mr. Luboff incorporated Gold Star Technology, Inc. ("Gold Star"), and opened a bank account for Gold Star. Pretrial Stip. ¶ 10; Pl.'s Ex. 21.  Mr. Luboff was the president and sole shareholder of Gold Star and in charge of its day-to-day operations.  Pretrial Stip. at ¶ 11.  On June 22, 2010 and June 30, 2010, through two separate transfers, Mr. Luboff caused the Debtor to transfer substantially all its cash in the amount of $159,200 to AHLO, Inc. ("AHLO"), who then transferred $159,200 in two transfers, each to Gold Star one day after receiving

the transfer. Pretrial Stip. ¶ 24-30; Pl.'s Ex. 25 and 26, 102. Mr. Luboff has known the principal of AHLO, Joe Lopez, for over twenty years and AHLO had done business with the Debtor since 2005. Pretrial Stip. at ¶¶ 20 and 21. After capitalizing Gold Star with the Debtor's cash, from 2010 through 2012, Mr. Luboff used Gold Star to operate the Debtor's business, and continue paying for the Luboffs' personal lifestyle by causing Gold Star to transfer a total of $419,744.11 to and for the benefit of the Luboffs (the "Gold Star Transfers"). Pretrial Stip. ¶ 18.

In another series of suspicious transactions in 2011, Mr. Luboff used AHLO's bank account to conduct the Debtor's business and avoid having cash flow exposed to the Debtor's creditors. In February of 2011, Gold Star sold approximately 4,000 monitors to AHLO for $728,774.82, with payment due within thirty days. *See* Trial Tr. 89:2-14; Ex. 30. Such amounts, however, were not paid by AHLO to Gold Star within the thirty days. *Id.* at 89:20-23. Instead, from February through August of 2011, Mr. Luboff directed AHLO to transfer $357,933.97 to vendors and Disc-O-Tech. *Id.* at 91:8-96:3; *See* Pl.'s Ex. 34, 38. Gold Star only received $370,840.85 of the account receivable owed by AHLO. *See id.*

Beginning in 2010, Mr. Luboff also used the Debtor's money to capitalize Disc-O-Tech, a company that Mrs. Luboff incorporated in 1996. Mr. Luboff was the president and sole shareholder of Disc-O-Tech and in charge of its day-to-day operations, and Mrs. Luboff was an officer of Disc-O-Tech until April 29, 2011. Pretrial Stip. at ¶ 3, 11; Pl.'s Ex. 93. Mr. Luboff capitalized Disc-O-Tech with money from the Debtor's customers. Between May 2010 through June 2012, Disc-O-Tech received transfers totaling

$1,560,361.56 from Tribeca Technology Solutions, Archbrook Laguna and AHLO, all customers of the Debtor. *See* Pl.'s Ex. 23 and *Order Granting Summ. J.,* ECF 264.

Between 2010 and 2013, Mr. Luboff used Disc-O-Tech to operate the Debtor's business and to pay for the Luboffs' lifestyle. Mr. Luboff caused Disc-O-Tech to transfer $690,749 to and for the benefit of the Luboffs (the "Disc-O-Tech Transfers"). Pretrial Stip. ¶ 17. During the Debtor's 2004 examination taken by the Trustee on November 3, 2014 (the "2004 Examination"), Mr. Luboff testified that:

> Well, I mean, with Sigma-Tech we were – we were limited to, you know, manufacturer's reps hiring us. Herb Spokane was declining in health, his son was no longer – Michael Spokane didn't last very long with us, and I just felt that I was going to – you know, I have – we had the company opened, and, you know, we had some – we had health insurance through the company, my wife was ill at the time, and I just felt it was better to concentrate on moving forth in a positive with the – with Liquidations and Disc-O-Tech, and just sort of move away and let the lawyers handle the Sigma-Tech because, you know, Office Depot owed us so much money, and because of that, you know, we owed some creditors some money.

Debtor's 2004 Exam. Tr. 146:14-19; Pl's. Ex. 52.

On January 2, 2013, the Luboffs' personal accountant organized Triple Play Sales, LLC ("Triple Play"), which became the third new successor entity that Mr. Luboff used to operate the Debtor's business and to fund the Luboffs' personal lifestyle. *See* Pl.'s Ex. 46, 50, 84 and 96. On January 15, 2013, Mr. Luboff emailed Joe Lopez, the principal of AHLO, a contract under which AHLO would pay Triple Play 40% of its net profit on any deals Triple Play brought to AHLO. *See* Pl.'s Ex. 46. Triple Play's annual reports for 2014 and 2015 identify Mrs. Luboff as Triple Play's managing member. *See* Pl.'s Ex. 96. The Luboffs applied for a general operating bank account for Triple Play on

January 28, 2015 with Wells Fargo. *See* Pl.'s Ex. 83. The application, which is signed by both Luboffs, states that Mrs. Luboff is the owner with control of the entity, and Mr. Luboff is the key executive with control of the entity. *See id*. Mr. Luboff had control over Triple Play's bank account. *See* Trial Tr. 115:13-18. From February 13, 2013 through October 4, 2016, Triple Play transferred a total of $338,978.81 to the Luboffs' joint Wells Fargo account ending in 6595 (the "Triple Play Transfers"). *See* Pl.'s Ex. 84-84A.

The Debtor Transfers, Gold Star Transfers, Disc-O-Tech Transfers, and the Triple Play Transfers (collectively, the "Transfers"), which total $1,602,956.99, benefited the Luboffs. The uncontroverted evidence shows that the Transfers consisted of: (i) checks and deposits into the Luboffs' joint Bank of America account ending in 1144 totaling $645,326.20, (ii) checks and deposits into the Luboffs' joint Wells Fargo account ending in 6595 totaling $338,978.81, (iii) cash withdrawals totaling $173,280, (iv) repayment of personal loans totaling $59,981.35, and (v) personal expenses for vehicles, personal credit cards, insurance, high-end retail, and travel totaling $385,390.63   Pretrial Stip. ¶ 16-18 and Pl.'s Ex. 84-84A. Mr. Luboff conceded that he and Mrs. Luboff benefited from certain transfers from Gold Star into the Luboff's joint bank account. *See* Trial Tr. 101:14-23. The funds in the joint bank accounts were used for family expenses, including but not limited to $296,000 in payments on a mortgage loan on which Mrs. Luboff and Mr. Luboff were liable, and $94,000 for a 2012 Porsche Cayenne owned by Mrs. Luboff. *See* Trial Tr. 43:10-46:9, 51:11-51:21; Pl.'s Ex. 85.

The evidence established that the Transfers either provided funds directly to the Luboffs for their personal use, or were payments for family expenses that benefited the Luboffs. No credible evidence was presented to show that the Transfers did not benefit the Luboffs. Mrs. Luboff was aware of her family's lifestyle, was involved with the companies, and even opened a Triple Play bank account as its owner in January 2015. She was also aware of potential trouble with Office Depot in 2007 and 2008, and testified that she knew that "something was happening in 2007 or 2008 with Office Depot, and it was an issue[.]" *See* Trial Tr. 122:8-12.

The Court does not find credible Mrs. Luboff's allegation that she did not know where any of the money she and her family used came from, including the money that paid for her 2012 Porsche Cayenne and 2011 Mercedes. *See* Trial Tr. 41:11-41:14, 46:3-46:9, 122:1-7. During trial, Mrs. Luboff admitted that she acquired her 2011 Mercedes in March 2011, and that Disc-O-Tech paid $57,936.51 for the 2011 Mercedes. *See id.* at 40:24-41:10; Pl.'s Ex. 79. When questioned about her 2012 Porsche Cayenne, Mrs. Luboff initially refused to answer asserting the Fifth Amendment privilege against self-incrimination. Trial Tr. 41:15-42:5. After the Court explained the ramification of asserting the Fifth Amendment privilege, Mrs. Luboff conceded that she acquired a 2012 Porsche Cayenne in October 2011 with monies from Gold Star and Disc-O-Tech. *See id.* at 43:10-46:9; Pl.'s Ex. 85. Between June 20, 2011 and March 28, 2012, $144,353.61 was transferred by Disc-O-Tech and from the Luboffs' joint Bank of America account ending 1144 to pay for the Porsche. Contradicting her earlier testimony that she did not handle the finances, Mrs. Luboff signed two personal checks issued to pay for a Porsche,

including a check in the amount of $37,500 dated June 18, 2011 and a check in the amount of $23,500 dated October 7, 2011 that were both made out to Champion Motors, the Porsche dealer which sold the Porsche to Mrs. Luboff. *See id.* at 39:19-24, 45:8-46:2, 48:19-48:24; Pl.'s Ex. 85A, Bates stamps Plaintiff's 2352 and 2353.

The Court finds shocking the degree to which the Luboffs misrepresented their income on their tax returns. Despite receiving over $1.6 million from the Transfers, the Luboffs' joint tax returns for the period of 2010 through 2015 reported income totaling a mere $173,374 in the aggregate, or less than 11% of their actual aggregate income. The Luboffs reported the following wages on their tax returns: $7,500 for 2010, $60,000 for 2011, $20,274 for 2012, $25,200 for 2013, $30,200 for 2014, and $30,200 for 2015. *See* Pl.'s Ex. 69-74. The Court finds inconceivable that Mrs. Luboff, living the lifestyle that she and her family lived, did not know that these tax returns which reported at most $60,000 in annual income were patently false.

The Court finds that Mr. Luboff is not credible, and that he perjured himself on numerous occasions. During the 2004 Examination, Mr. Luboff falsely testified that Gold Star operated for six months and ceased operations in 2011, and that Gold Star "was not a very successful company" and had "[m]inimal, if any" sales. Debtor's Rule 2004 Exam. Tr. 76:20-25, Pl.'s Ex. 52. Gold Star, however, generated over at least $3.8 million in sales in 2011, and transferred over $400,000 to and for the benefit of the Luboffs during 2010 and 2012. *See* Trial Tr. 96:8-98:23, 108:3-15. Mr. Luboff also falsely testified that as of November 2011, he was unemployed and had been unemployed for eight or nine months. *See* Pl.'s Ex. 52, 2004 Examination 20:11-14. During this time,

9

however, he was conducting business, and generating income, through Triple Play. *See* Trial Tr. 108:16-115:18, Pl.'s Ex. 84. Further, the Luboffs failed to disclose their interests in Triple Play in their Chapter 13 joint bankruptcy schedules filed in *In re Luboff*, Case No. 17-14965-RBR. *See* Trial Tr. 115:19-119:2; Pl.'s Ex. 104.

Uncontroverted testimony from the Plaintiff's expert, Soneet Kapila ("Mr. Kapila"), established that the Debtor, Gold Star and Disc-O-Tech (collectively, the "Luboff Companies") were insolvent by more than four million dollars between December 31, 2008 and January 21, 2014, the Petition Date. *See* Trial Tr. 17:21-18:1. Mr. Kapila reconstructed the Luboff Companies' balance sheet for the year end from 2008 through 2013. *See* Pl.'s Ex. 86, Ex. A; Trial Tr. 16:23-17:20. The balance sheet shows that the Luboff Companies' total assets never exceeded $1,452,113 and liabilities always exceeded $4,658,069, and the Luboff Companies were insolvent by at least $4,649,739. *See* Pl.'s Ex. 86, Ex. A. Further, the Luboff Companies' combined daily bank balances from December 31, 2008 through December 31, 2013 never exceeded $550,000, which is an amount well below the threshold to establish solvency. *See* Pl.'s Ex. 86 § V(2)(B)(a).

### A.     Fraudulent Transfer Under Florida Statutes

The Trustee may "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim[.]" 11 U.S.C. § 544(b)(1); *In re Aqua Clear Techs., Inc.*, 361 B.R. 567, 583 (Bankr. S.D. Fla. 2007). "To invoke these avoidance powers, the Trustee must demonstrate: (i) the existence of an actual creditor; (ii) with an allowable claim; (iii)

who under non-bankruptcy law could avoid the Transfer, at least in part." *Id*. (citing 11 U.S.C. § 544(b)). Based upon the claims of Office Depot and New England discussed above, the Trustee has established the existence of actual creditors with allowable claims under 11 U.S.C. § 502 who could have avoided the Transfers.

### 1. Actual Fraudulent Transfers Under Section 726.105(1)(a) of the Florida Statutes (Count I)

Pursuant to the Trustee's statutory powers under 11 U.S.C. § 544, the Trustee can recover transfers made with "actual intent to hinder, delay, or defraud any creditor of the debtor" under Florida law. *See* 11 U.S.C. § 544; Fla. Stat. § 726.105(1)(a); *Aqua Clear*, 361 B.R. at 583. Under Florida law, the following nonexclusive list of factors can be considered to determine the validity of a transfer: (a) the transfer was to an insider, (b) the debtor retained possession or control of the property transferred after the transfer, (c) the transfer was disclosed or concealed, (d) before the transfer was made, the debtor had been sued or threatened with suit, (e) the transfer was of substantially all the debtor's assets, (f) the debtor absconded, (g) the debtor removed or concealed assets, (h) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred, (i) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred, (j) the transfer occurred shortly before or shortly after a substantial debt was incurred, and (k) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. Fla. Stat. § 726.105(2). "While a single badge of fraud may amount only to a suspicious circumstance, a combination of badges will justify

11

a finding of fraud." *Aqua Clear*, 361 B.R. at 580 (citing *United States v. Fernon,* 640 F.2d 609, 613 (5th Cir.1981)). The presence of several badges of fraud gives rise to a rebuttable inference of fraud. *Id.* (citing *Advest, Inc. v. Rader,* 743 F.Supp. 851, 854 (S.D.Fla.1990)). In this case, nine of the badges of fraud are present.

First, the Transfers were made to the Luboffs, who are insiders of the Debtor, Disc-O-Tech, Gold Star and Triple Play. *See* 11 U.S.C. § 101(31)(B) (defining insider of a corporation to include directors, officers, persons in control, and relatives of the foregoing parties). Second, the Debtor retained possession or control of the property transferred. The Court already determined that Disc-O-Tech and Gold Star are alter egos and mere continuations of the Debtor, and subject to successor liability. *See* Order Granting Summ. J., ECF 264, and Final Judgment, ECF 347. The Luboff Companies operated out of the same location in Coral Springs, Florida, were all involved in the purchase and sale of consumer electronics and accessories, used the same fictitious names Liquidations Direct and Liquidationsdirect.com, and shared AHLO, Archbrook Laguna and Tribeca Technology Solutions as customers. Pretrial Stip. ¶ 13-15. *See also,* Order Granting Summ. J., ECF 264.

Likewise, Triple Play is an alter ego and mere successor to the Debtor. It is undisputed that Triple Play was controlled by Mr. Luboff, sold the same products and generated revenue from a contract with the Debtor's longtime customer, AHLO (Disc-O-Tech, Gold Star and Triple Play are referred to as the "Successor Companies"). The Court further concludes, as discussed below, that Mr. Luboff is an alter ego of the Debtor. *See* infra B.2. Thus, because the Debtor, the Successor Companies, and Mr.

Luboff are all legally one and the same, the Debtor retained possession of the property despite the Transfers.

Third, the Transfers were concealed, and fourth, the Debtor's assets were removed and concealed. As described above, Mr. Luboff shifted the Debtor's assets and business into Gold Star, Disc-O-Tech, and Triple Play, and used these companies to hide income that was transferred to and for the benefit of the Luboffs. Mr. Luboff even used AHLO's bank account to maintain a significant receivable for a period of approximately seven months, and directed the use of payments due from AHLO to pay various parties for his business transactions. During the 2004 Examination, Mr. Luboff falsely testified to the Trustee that he was not working, and had not worked for eight or nine months, and concealed from the Trustee that he had been and continued to conduct business through Triple Play. Mr. Luboff also incorrectly testified that Gold Star was not profitable and had minimal sales. Further, the Luboffs failed to report the Transfers as income on their joint tax returns. The Luboffs fraudulent misrepresentations continue in their personal bankruptcy case, in which they fail to disclose any interest in Triple Play on their bankruptcy schedules.

Fifth, as discussed above, before the Transfers were made, Office Depot and New England had sued the Debtor. Sixth, substantially all the Debtor's remaining money was transferred to AHLO, who then transferred the same amount to Gold Star, and the Debtor's customer payments were redirected to Disc-O-Tech.

Seventh, the value of the consideration received by the Debtor was not reasonably equivalent to the value of the asset transferred. The Luboffs presented no evidence to

suggest that they provided any value in exchange for the Transfers. The Luboffs did not indicate that the Transfers constituted wages on their tax returns. Nor did they provide any services to the Debtor to permit it to prosper. *See In re Kane & Kane*, 09-15556-EPK, 2013 WL 1197609, at *12 (Bankr. S.D. Fla. Mar. 25, 2013) (stating that if the company's principal's "efforts were in fact not sufficient to cause the Debtor to prosper, then those efforts would not be entitled to remuneration[,]" and the "fact that the Debtor would not have existed but for the efforts of [the principals] does not mean that their efforts resulted in value to the Debtor equal to the compensation they received."). Rather, Mr. Luboff stripped the Debtor of its value, transferred such value to other companies he and Mrs. Luboff controlled, and caused these entities to support the Luboffs' lifestyle with funds totaling over $1.6 million dollars. The Debtor and its creditors received no benefit from the transfers.

Eighth, the Luboff Companies were insolvent while and after the Transfers were made. As discussed above, uncontroverted expert testimony from Mr. Kapila established that the Luboff Companies were insolvent by over four million dollars during the period that the Transfers were made. Ninth, many of the Transfers occurred shortly before or shortly after a substantial debt was incurred. In December of 2009, the Debtor agreed to pay Office Depot $3,669,920.60. Pretrial Stip. at ¶ 4; Pl.'s Ex. 6, 11. On May 24, 2010, the Debtor settled its disputes with New England by promising to pay $950,000. Pretrial Stip. at ¶ 9. Around this time, the Debtor ceased to do business, and Mr. Luboff began to conduct business through Gold Star and Disc-O-Tech.

As discussed above, the Court finds that the Transfers benefitted the Luboffs. Mrs. Luboff's testimony was not credible. At first, Mrs. Luboff testified that she did not handle the finances and had no knowledge of Mr. Luboff's fraudulent conduct. Yet, the evidence shows that Mrs. Luboff signed over $60,000 in checks made out to Champion Motors for her Porsche in 2011, and that she opened Triple Play's bank account with Wells Fargo in January of 2015 as its owner. Mrs. Luboff's willful ignorance of the source of the funds that supported her and her family's lifestyle is insufficient to prevent liability, especially in light of her failure to declare any of the Transfers as income on her tax returns. *See In re Grim*, 293 B.R. 156, 164 (Bankr. N.D. Ohio 2003) (concluding that willful ignorance was not a valid defense to the allegation of fraud); *see also In re Roberts*, 538 B.R. 1, 17 (Bankr. C.D. Cal. 2015) (noting that "[w]illful ignorance is not an excuse" to financial misrepresentation).

The Successor Companies were capitalized with either the Debtor's money or revenue from the Debtor's customers. It is unrefuted that Mr. Luboff used the Successor Companies to evade paying the Debtor's creditors and continue to fund the Luboffs' personal lifestyle. Therefore, the Trustee is entitled to recover the transfers made by the Debtor and the Successor Companies that ultimately benefitted Mr. and Mrs. Luboff.

Moreover, the Trustee can also recover the Transfers that occurred in 2009 that are outside of the four years prior to the Petition Date because the Trustee brought the Complaint within one year after the transfers could reasonably have been discovered by the Trustee. *See* Fla. Stat. Ann. § 726.110 (1).

Based on the foregoing, the Trustee has established that the Transfers benefited the Luboffs, and were made with the actual intent to hinder, delay or defraud creditors and are avoided pursuant to 11 U.S.C. § 544 and Fla. Stat. § 726.105(1)(a). The Trustee accordingly can recover the amount of the Transfers pursuant to 11 U.S.C. § 550(a). The Court will enter judgment in favor of the Trustee on Count I in the amount of $1,602,956.99 against Mr. Luboff and Mrs. Luboff, jointly and severally.

### 2. Constructive Fraudulent Transfers Claims Under Sections 726.105(1)(b), and Section 726.106(1) of the Florida Statutes (Counts II and III)

Under 11 U.S.C. § 544 and sections 726.105(1)(b) and 726.106(1) of the Florida Statutes, transfers that were made for less than reasonably equivalent value while a debtor is insolvent, or caused the insolvency, are likewise avoidable. Fla. Stat. §§ 726.105(1)(b) and 726.106(1). As discussed above, the Transfers were made for no consideration, to or for the benefit of the Luboffs, while the Luboff Companies were insolvent by more than four million dollars. The Trustee has established that the Transfers, made within four years of the Petition Date should be avoided pursuant to 11 U.S.C. § 544, and can recover that amount under 11 U.S.C. § 550(a). However, because the damages awarded in favor of the Plaintiff on the constructive fraudulent transfer Counts II and III are duplicative of the damages awarded in Count I, there is no need for the Court to enter an additional damage award as to Counts II and III and instead finds that Counts II and III constitute separate and independent bases for the damages awarded pursuant to Count I.

### B. Breach of Fiduciary Duty (Count VII)

The Trustee seeks judgment against Mr. Luboff because he breached his fiduciary duty to the Debtor, and is an alter ego of the Debtor[1]. Under applicable Florida law, each manager owes fiduciary duties of loyalty and care to his or her limited liability company. Fla. Stat. § 605.04091(1). "The duty of care in the conduct or winding up of the company's activities and affairs is to refrain from engaging in grossly negligent or reckless conduct, willful or intentional misconduct, or a knowing violation of law." Fla. Stat. § 605.04091(3). The duty of loyalty includes *inter alia* properly winding up a company's activities and affairs, refraining from improper use of a company's property and competing with the company before dissolution, and not appropriating a company opportunity. *See* Fla. Stat. § 605.04091(2)(a). "An officer's or director's fiduciary duties are extended to the creditors of a corporation when the corporation becomes insolvent or is in the 'vicinity of insolvency'". *Aqua Clear*, 361 B.R. 567, 575 (Bankr. S.D. Fla. 2007); *In re Trafford Distrib. Ctr., Inc.*, 431 B.R. 263, 290 (Bankr. S.D. Fla. 2010) ("The fiduciary duties of officers and directors are extended to the creditors of a corporation when the corporation becomes insolvent or is in the 'vicinity of insolvency.'"); *In re SOL, LLC*, 09-12684-BKC-AJC, 2012 WL 2673254, at *16 (Bankr. S.D. Fla. July 5, 2012) (concluding the principals of a limited liability company "owed a fiduciary duty to the [company's] creditors once the [company] became insolvent or was in the vicinity of insolvency."). "To permit corporate officers and director to use their fiduciary positions

---

[1] While not explicitly pleaded in the Amended Complaint [ECF 81], pursuant to Fed. R. Civ. P. 15(b)(2), made applicable to these proceedings by Bankruptcy Rule 7015, this matter was "tried by the parties' express or implied consent and must be treated in all respects as if raised in the pleadings."

17

to obtain preferential treatment at the expense of third-party creditors is manifestly unfair." *Trafford*, 431 B.R. at 290.

### 1. Mr. Luboff breached His fiduciary duty to the Debtor and its creditors

As discussed above, the uncontroverted evidence established that the Luboff Companies were insolvent during the relevant period, and thus Mr. Luboff owed a fiduciary duty to the Debtor's creditors. Mr. Luboff, however, breached his duty of care, and duty of loyalty to the creditors. After he removed all value from the Debtor, he delivered an empty shell to the Trustee. After the Debtor incurred millions in debt, Mr. Luboff diverted the Debtor's business and assets into Disc-O-Tech, Gold Star and Triple Play to conceal assets from the Debtor's creditors, to continue using the proceeds from the Debtor's business to pay for the Luboffs' lifestyle through the Transfers. Mr. Luboff further breached his duty of care and duty of loyalty by treating the Debtor, Disc-O-Tech, Gold Star and Triple Play as one and the same, and using the Successor Companies as mere continuations and alter egos of the Debtor. He dominated and controlled these companies at all relevant times. He caused the Debtor to fail to adhere to any type of corporate governance, independence or formality. Mr. Luboff made a profit and acquired other personal benefits and advantages in his dealings with the Successor Companies, to the detriment of the Debtor and its creditors.

Accordingly, the Court holds that Mr. Luboff breached his fiduciary duties to the Debtor and its creditors, and will enter judgment against Mr. Luboff and in favor of the Trustee on Count VII in the amount discussed below.

### 2. Mr. Luboff is the Alter Ego of the Debtor.

The Trustee contends that Mr. Luboff is an alter ego of the Debtor, and the corporate veil should be pierced to hold him liable for the debts of the Debtor. The Eleventh Circuit has stated that for a claimant to pierce the corporate veil in Florida, it must establish that:

> (1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence was in fact non-existent and the shareholders were in fact alter egos of the corporation; (2) the corporate form must have been used fraudulently or for an improper purpose; and (3) the fraudulent or improper use of the corporate form caused injury to the claimant.

*Eckhardt v. United States*, 463 F. App'x 852, 855-56 (11th Cir. 2012) (quoting *Gasparini v. Pordomingo,* 972 So.2d 1053, 1055 (Fla. 3d DCA 2008)).

"Piercing the corporate veil is proper if the corporation is a mere device or sham to accomplish some ulterior purpose, or is a mere instrumentality or agent of another corporation or individual owning all or most of its stock, or where the purpose is to evade some statute or to accomplish some fraud or illegal purpose." *Eckhardt*, 463 F. App'x at 855 (quotations omitted). "The veil will be pierced and the corporate entity disregarded if it is shown that the corporation is formed or used for some illegal, fraudulent or other unjust purpose which justifies piercing the corporate veil." *Id*. at 856 (quotations omitted). "Improper conduct exists where a corporation is used "as a subterfuge to mislead or defraud creditors, to hide assets, to evade the requirements of a statute or some analogous betrayal of trust." *Id*. (quoting *Lipsig v. Ramlawi,* 760 So.2d 170, 187 (Fla. 3d DCA 2000)).

The uncontroverted evidence establishes that Mr. Luboff is the alter ego of the Debtor.  He dominated and controlled the Debtor to such an extent that it enjoyed no independent existence.  Mr. Luboff improperly diverted the Debtor's assets and revenue to the Successor Companies to avoid paying the Debtor's creditors, and continue supporting the Luboffs' personal lifestyle.  He caused the Debtor to use its corporate funds to benefit the Luboffs rather than pay its creditors. *Eckhardt*, 463 F. App'x at 856 ("One important factor relevant to whether an individual dominates the corporation to such an extent as to negate its separate identity is whether corporate funds were used for the individual's benefit.").  The Court has already entered a separate judgment against Gold Star and Disc-O-Tech as alter egos and mere continuations of the Debtor, who are subject to successor liability. *See* ECF 347.

Based on the foregoing, the Court holds that Mr. Luboff is the alter ego of the Debtor and the corporate veil should be pierced to hold him liable for the Debtor's debts. The Court shall enter judgment against Mr. Luboff and in favor of the Trustee on Count VII in the amount of $6,905,597.86, which is the amount of the allowed claims against the Debtor.

The Court will enter a separate final judgment in favor of the Trustee pursuant to Fed. R. Civ. P. 58, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7058.

SO ORDERED.

###

Copies to: all parties in interest.